# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | |
|---|---|
| **UNITED STATES OF AMERICA and** )<br>**THE STATE OF TENNESSEE** *ex rel.* )<br>**[UNDER SEAL]** )<br> )<br> )<br>  **Plaintiffs,** )<br> )<br>**v.** )<br> )<br>**[UNDER SEAL]** )<br> )<br>  **Defendants.** | **Civil Action No. 3-16-561**<br><br>*FILED UNDER SEAL*<br><br>Judge Waverly Crenshaw<br><br>Magistrate Clifton Knowles |

## FIRST AMENDED COMPLAINT
### *FILED UNDER SEAL*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TENNESSEE *ex rel.* MARY BUTNER, and DANA BROWN | )<br>)<br>)<br>) |
| | ) Civil Action No. 3-16-561 |
| Plaintiffs, | )<br>) |
| v. | ) *FILED UNDER SEAL*<br>) |
| ANESTHESIA SERVICES ASSOCIATES, PLLC, d/b/a/ COMPREHENSIVE PAIN SPECIALISTS, PETER KROLL, STEVEN DICKERSON, RONALD WILLIAMS, REX WILLIAMS, TIMOTHY BEACHAM, LINDSAY BISHOP, GILBERTO CARRERO, DENNIS HARRIS, DONALD JONES, FRANK JORDAN, ANDREW KELLER, JAMES LADSON, BARBARA SCHOOLEY, CHARLES LINDSAY, DANIEL MCHUGH, RICHARD MUENCH, TODD PEPPER, ANASTASIA TERESCHUK, DEANNE THREAPLETON, CODY TURNER, J. RANDALL UNDERWOOD, and KYLE PAYNE | )<br>) Judge Waverly Crenshaw<br>)<br>) Magistrate Clifton Knowles<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## FIRST AMENDED COMPLAINT

Relators Mary Butner and Dana Brown file this First Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B), prior to any responsive pleading being filed. Relators bring this action on behalf of themselves and in the names of the United State of America and the State of Tennessee, by and through their undersigned attorneys, and allege as follows:

1

1. This is a civil action brought by the United States for treble damages, civil penalties, and costs under the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.,* and to recover damages for violation of the Anti-Kickback Statutes, 42 U.S.C. §§ 1320a-7a & 7b, as well as the Federal Referral Law ("Stark Law"), 42 U.S.C. § 1395nn.

2. The Relators, on behalf of themselves and the State of Tennessee, also bring this action to recover treble damages, civil penalties, and costs under the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-181 *et seq.*

3. This action arises from Defendants' fraud and conspiracy to defraud Medicare, TriCare, and TennCare. This action encompasses the false claims, materially false statements, and fraudulent documents that the Defendants knowingly presented, or caused to be presented to, the United States, in violation of the False Claims Act ("FCA"), and the State of Tennessee, in violation of the Tennessee Medicaid False Claims Act ("TMFCA").

## PARTIES

4. Plaintiff Mary Butner, relator and *qui tam* plaintiff, is a citizen of the United States and a resident of Sumner County, Tennessee, and a former employee of the Defendant CPS.

5. Plaintiff Dana Brown, relator and *qui tam* plaintiff, is a citizen of the United States and a resident of Sumner County, Tennessee, and a former employee of the Defendant CPS.

6. Defendant Anesthesia Services, Associates, PLLC d/b/a Comprehensive Pain Specialists (hereafter "CPS"), is a professional limited liability company formed in the State of Tennessee, with its Principal Office located at 1650 Murfreesboro Road, Suite 145, Franklin, TN 37067-5095. CPS's registered agent is National Registered Agents, Inc., located at 800 S. Gay Street, Suite 2021, Knoxville, TN 37929-9710. CPS also operates a pharmacy under the assumed name of Comprehensive Wellness Pharmacy.

7. CPS is a pain management group comprised of a group of physicians and other staff who provide medical services and assist patients with managing chronic pain. CPS is an In-Network Provider for various private insurance companies, including TriCare, and CPS also provides medical services to eligible Medicare and TennCare/Medicaid beneficiaries at each of its locations.

8. CPS operates in over sixty (60) locations across twelve (12) states, including Alabama, Arkansas, Illinois, Indiana, Kentucky, Missouri, Mississippi, North Carolina, Ohio, South Carolina, and Tennessee. In Tennessee, there are twenty-nine (29) CPS offices.

9. CPS operates a lab, in which CPS principals, including Dr. Steven Dickerson and Dr. Peter Kroll, are shadow owners who have a financial interest in the operation of the Lab. The lab is known only as the "Franklin Lab." The address provided is 325 Seaboard Lane, Suite 110, Franklin, TN 37067. Jeff Hurst is listed as the Site Manager for the Franklin Lab in the internal CPS directory, and is also listed as the "Director of Laboratory" on the Executive Profile for the Defendant Anesthesia Services Associates, in which Defendant Steven Dickerson is listed as the President.

10. Defendant Peter B. Kroll, M.D., is an anesthesiologist and is also a principal and member of the Defendant Anesthesia Services Associates, PLLC d/b/a Comprehensive Pain Specialists, PLLC. Dr. Kroll is the overseeing physician at the CPS locations in Gallatin TN, Hendersonville TN, Bowling Green KY, Clarksville TN, Centennial A and B in Nashville TN. He is the Medical Director of the CPS locations in Gallatin, TN, and Hendersonville, TN, and Clarksville, TN.

11. Defendant Steven Dickerson, M.D., is an anesthesiologist and is also a principal and member of the Defendant CPS. Dr. Dickerson is the Medical Director of the CPS

location at 2400 Patterson Street, Suite 217, Nashville, TN 37203. Dickerson is the President of Anesthesia Services Associates, PLLC.

12. Defendant Rex Williams, M.D., is a resident of Mississippi and a doctor employed by the Defendant Anesthesia Services Associates. He is the overseeing physician in the CPS office located at 120 Stone Creek Blvd, Suite 500, Flowood MS 39232.

13. Defendant Ronald Williams, M.D., is a resident of Mississippi and doctor employed by Defendant Anesthesia Services Associates. He is the overseeing physician in the CPS office located at 120 Stone Creek Blvd, Suite 500, Flowood MS 39232.

14. Defendant Timothy Beacham, M.D., is a resident of Mississippi and a doctor employed by the Defendant Anesthesia Services Associates. He is the overseeing physician in the CPS office in Greenville, Mississippi. He also works in the Cleveland Mississippi CPS office.

15. Defendant Lindsay Bishop, P.A., is a resident of Tennessee and a physician's assistant employed by the Defendant Anesthesia Services Associates working in the CPS office in Dickson, Tennessee.

16. Defendant Gilberto Carrero, M.D., is a resident of Tennessee and a member of the Defendant Anesthesia Services Associates. He is the medical director for the CPS facility at 3901 Central Pike, Suite 259, Hermitage, TN, 37076.

17. Defendant Deanne Threapleton is a resident of Tennessee and is a family nurse practitioner working for the Defendant Anesthesia Services Associates in the CPS facility located at 3901 Central Pike, Suite 259, Hermitage, TN 37076.

18. Defendant Dennis Harris, M.D., is a resident of Tennessee and is the Medical Director for the CPS facility located at 4709 Papermill Road, Knoxville, TN 37909, as well as the CPS facility located at 420 W. Morris Blvd, Morristown, TN 37813.

19. Defendant Donald Jones, M.D., is a resident of Tennessee and is the Medical Director and the overseeing physician for (1) the CPS facility located at 200 New York Avenue, Suite 150, Oak Ridge, TN 37830, and (2) the CPS facility located at 103 Station Drive, Maryville, TN 37804. He is the Medical Director for the CPS facility located at 460 Medical Drive, Suit 104, Lenoir City, TN 37772.

20. Defendant Frank Jordan, M.D., is a resident of Tennessee and is the Medical Director for (1) the CPS facility located at 1010 Wayne Road, Suite 302, Savannah, TN 38372, and (2) the CPS facility located at 1015 Kelly Drive, Suite 200, Paris TN 38242. He is the overseeing physician for (1) the CPS facility located at 6570 Stage Road, Suite 130, Bartlett, TN 38134, (2) the CPS facility located at 160 C West University Parkway, Jackson, TN 38305, (3) the CPS facility at 1015 Kelly Drive, Suite 200, Paris TN 38242, and (4) the CPS location at 700 Sherrill Street, Suite B, Union City, TN 38261.

21. Defendant Andrew Keller, M.D., is a resident of Tennessee and is a doctor employed by the Defendant Anesthesia Services Associates at 200 New York Avenue, Suite 150, Oak Ridge, Tennessee.

22. Defendant James Ladson, M.D., is a resident of Tennessee and is the Medical Director for (1) the CPS location in 301 Richard Wilks road, Suite 600, White House, TN 37188 (2) the CPS location in 176 Briarwood Street, Suite B, Camden, TN 38320, (3) the CPS location at 3443 Dickerson Pike, Suite 250, Nashville, TN 37207, and (4) the CPS location at 300 Northcrest Drive, Suite 308, Springfield, TN 37172.

23. Defendant Barbara Schooley, M.D., is a resident of Tennessee and is an anesthesiologist employed at the CPS clinic location in 301 Richard Wilks Road, Suite 600, White House, TN 37188. She is listed as the Medical Director for Nashville Neurological Care Clinic, 2200 21st Avenue South, Suite 306, Nashville, TN 37212.

24. Defendant Daniel McHugh, M.D., is a resident of Tennessee and is the Medical Director for the CPS location at 4601 Carothers Pkwy, Suite 275, Franklin TN, 37067.

25. Defendant Richard Muench, M.D., is a resident of Tennessee and is the Medical Director for (1) the CPS facility located at 1040 N. James Campbell Blvd, Suite 108, Columbia, TN 38401, and (2) the CPS facility located at 10400 Ramsey Way, Dickson, TN 37055. He is the overseeing physician for (1) the CPS facility located at 10400 Ramsey Way, Dickson TN 37055; (2) the CPS facility located at 176 Briarwood Ave, Suite B, Camden, TN 38320; (3) the CPS facility located at 1040 N. James Campbell Blvd, Suite 108, Columbia TN, 38401; (4) the CPS facility located at 522 B-2 Brandies Circle, Murfreesboro TN 37128; and (5) the CPS facility located at 1801 North Washington, Suite 600, Tullahoma, TN 37388. He is listed as the "interim" overseeing physician for (1) the CPS facility located at 623 Congress Pkwy South, Athens TN 37303, and (2) the CPS facility located at 260 16th Ave, Unit 138, Dayton, TN 37321.

26. Defendant Todd Pepper, M.D., is a resident of Tennessee and is the Medical Director for (1) the CPS facility located at 1726 Gun Barrel Road, Chattanooga, TN 37421, (2) the CPS facility at 260 16th Avenue, Suite 4, Dayton, TN 37321, and (3) the CPS facility located at 623 Congress Parkway South, Athens, TN 37303. Dr. Pepper is the overseeing physician for the CPS facility located at 260 16th Ave. Unit 138, Dayton, TN 37321, and the CPS facility located at 623 Congress Pkwy South, Athens, TN 37303.

27. Dr. J. Randall Underwood, M.D., is a resident of Tennessee and is the Medical Director for (1) the CPS facility located at 315 N. Washington Street, Suite 210, Cookeville, TN 38501, (2) the CPS facility located at 121 Village Drive, Suite 102, Portland TN 37148, and (3) the CPS facility located at 5002 Crossing Circle, Suite 240, Mount Juliet, TN 37122. He is the overseeing physician for (1) the CPS facility located at 315 N. Washington Street, Suite 210, Cookeville, TN 38501, (2) the CPS facility located at 5002 Crossing Circle, Suite 240, Mount Juliet, TN 37122, (3) the CPS facility located at 522 B-2 Brandies Circle, Murfreesboro, TN 37128, the (4) CPS facility located at 3443 Dickerson Pike, Suite 250, Nashville, TN 37207, and (5) the CPS facility located at 300 Northcrest Drive, Suite 307, Springfield TN 37172.

28. Defendant Charles Lindsay is a resident of Tennessee and is a Physician Assistant for the CPS location at 315 N. Washington Ave, Suite 210, Cookeville TN 38501.

29. Defendant Anastasia Tereschuk is a resident of Tennessee and a licensed nurse practitioner working for the Defendant Anesthesia Services Associates in the CPS facility located at 353 New Shackle Island Rd, Hendersonville TN 37075. Upon information and belief, she also works or worked in the CPS facility located at 315 N. Washington Ave, Suite 210, Cookeville, TN 38501.

30. Defendant Cody Turner is a resident of Tennessee and is a physician's assistant working for the Defendant Anesthesia Services Associates in the CPS facility located at 315 N. Washington Street, Suite 210 Cookeville, TN 38501.

31. Defendant Kyle David Payne, M.D., is a resident of Tennessee and is the Medical Director for (1) the CPS facility located at 160 C. West University Parkway, Jackson TN 38305, (2) the CPS facility located at 6570 Stage Road, Suite 130, Bartlett TN, 38134, (3)

the CPS facility located at 700 Sherrill Street, Suite B, Union City TN, 38261, (4) and the CPS facility located at 880 Pickwick Road, Suite 2, Savannah TN, 38372.

32. Dr. Timothy Arney, M.D., who passed away on August 14, 2014, was the overseeing physician for (1) the CPS facility located at 1048 Ashley Street, Suite 103A, Bowling Green Kentucky, 42103, (2) the CPS facility located at 2400 Patterson Street, Suite 217-B, Nashville, TN 37203, (3) the CPS facility located at 4601 Carothers Pkwy, Suite 275, Franklin TN 37067, and (4) the CPS facility located at 3901 Central Pike, Suite 259, Hermitage, TN 37076.

## JURISDICTION AND VENUE

33. As required under the False Claims Act, 31 U.S.C. § 3730 and the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-181 *et seq.*, the Relators have filed this action *in camera* and under seal, and have provided the United States Attorney for the Middle District of Tennessee with a statement of all material evidence and information related to the complaint. Relators have likewise served a copy of this Amended Complaint and the written disclosure statement upon the State of Tennessee pursuant to T.C.A. § 71-5-183(b).

34. The United States of America is named as a plaintiff pursuant to 31 U.S.C. § 3730(b)(1), and jurisdiction lies in this court pursuant to 28 U.S.C. §§ 1331, 1345, and personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a). This Court has jurisdiction over the Tennessee Medicaid False Claims Act claims pursuant to 31 U.S.C. § 3732(b).

35. Venue is proper pursuant to 28 U.S.C. § 1391(b) and 1391(c) in that the Defendant CPS does business in this district and the claims set forth in this complaint arose in this district.

## FACTS

36. The allegations contained herein are based on non-public information, and the Relators are the original sources of the information, each having direct and independent knowledge of the information on which these allegations are based. 31 U.S.C. § 3730(e)(4)(B).

37. On or about November 5, 2012 Relator Mary Butner began working for the Defendant as an "insurance specialist" for the Defendant's pain clinics. She worked primarily at the CPS office in Gallatin, Tennessee. Her job duties included radiology scheduling, and preparation of "Pre-Certs," which are documents submitted to insurance companies, Medicare, Medicaid, and TriCare, in order to obtain authorization for services to be rendered to a patient. Ms. Butner held this position until her termination in February of 2016.

38. On or about June of 2014, Relator Dana Brown was employed by the defendant as a "radiology scheduler," but worked closely with Relator Butner and performed substantially the same job duties until her termination in February of 2016.

39. The Defendants are required to have an authorized "precertification," "Pre-Cert," "preauthorization," or "prior authorization" for various services for each patient. The terms are used interchangeably. The preauthorization process is designed to check for the existence of records and testing that support each diagnosis and the related prescriptions with required documentation.

40. The Bureau of TennCare identifies certain items or services that require prior authorization in order to determine medical necessity of the procedures. Tenn. Comp. R. & Regs. 1200-13-16-.04.

41. The insurance companies also required that Defendants have all patients obtain radiological imaging, such as MRIs or CT-scans, prior to being prescribed any pain medication. The Relators were primarily in charge of filling out the necessary Pre-Cert for each patient's required radiological imaging service.

42. These prior authorizations were also needed for the medication prescription itself. The Defendant pain clinics apply for preauthorization through Medicare, TennCare, and TriCare to show that the patient has a medical need for the narcotics that are prescribed. Once the medications are preauthorized, the patient is given the prescription, takes it to a pharmacy to be filled, and the Defendants charge for the office visit and filling the prescription.

43. In order to obtain a Pre-Cert, the Relators would enter the physician's National Provider Identifier ("NPI") onto the forms, fill out the requested information, and submit them to various health care providers. For a Pre-Cert to be approved, a physician must not only be licensed in a particular state, but also credentialed with the various providers from which services are requested. If a physician ordered services at a health care provider and attempted to submit a Pre-Cert without having either the proper state license or the proper credentialing at a facility, the health care provider would deny the Pre-Cert until a properly licensed and credentialed physician had signed the document.

44. As alleged herein, the Defendants implemented a scheme to affix physician's signatures on Pre-Certs and to manipulate patient records on prior authorizations and other documents in order to have them approved, when in fact the physician had never examined the patient. The purpose of this scheme was to increase the volume of patients and thereby increase the Defendants' gross revenue. The Defendant submitted, or caused

to be submitted these false records to Tricare, TennCare and Medicare for reimbursement of the costs of the office visit, the work done on the Pre-Cert, filling the narcotics prescriptions, as well as any other services purportedly rendered by the Defendants.

*TriCare.*

45. As provided by statute, 10 U.S.C. § 1074, 1111(a), and 1113(a), TriCare is a federally funded program providing health care benefits to the spouses and unmarried children of active duty and retired service members, certain reservists on active duty, unmarried spouses and children of deceased service members, and retired service members. 32 C.F.R. § 199.4(a). TriCare is a comprehensive managed health care program.

*Medicare*

46. When submitting claims to Medicare, the Defendants used claim forms containing the following certification:

> **SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA, AND BLACK LUNG)**
>
> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or Champus regulations.

47. When submitted claims to Medicare, the Defendants signed, or had another CPS employee sign, the certification above, and presented the claim for payment.

48. For each violation, the False Claims Act provides for a civil penalty of $5,500 to $11,000 for each violation, and treble the damages suffered by the United States.

*TennCare - Medicaid*

49. The United States provides funds to the State of Tennessee Division of Health Care Finance & Administration (HCFA) through the Medicaid program, pursuant to Title XIX

of the Social Security Act, 42 U.S.C.A. §§ 1396 et seq.. Enrolled providers of medical to services to Medicaid recipients are eligible for reimbursement for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing reimbursement, and to keep and allow access to records and information required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State of Tennessee HCFA.

50. Among the rules and regulations which enrolled providers agree to follow are, inter alia: (a) bill the HCFA for any of those covered services which are medically necessary; (b) neither bill the HCFA for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information to the HCFA relating to provider costs or services; (c) not engage in any act or omission that constitutes or results in over utilization of services; (d) be fully licensed and/or certified under all applicable state and federal laws to perform the services provided to the recipients; (e) comply with state and federal statutes, policies and regulations applicable to the Medicaid program; and (f) not engage in any illegal activities related to the furnishing of services to recipients.

51. Defendant CPS was a participating Medicaid provider. The Defendant had a policy and practice of submitting claims to Medicaid for pain management and related services. The

Medicaid program constituted a significant source of gross revenue for CPS and all individual Defendants.

52. Pursuant to T.C.A. § 71-5-19(a)(1), the Tennessee legislature adopted a uniform TennCare claims process and directed the Department of Commerce and Insurance to promulgate rules regulating the same. Pursuant to this directive, the Department of Commerce adopted the use of the HCFA-1500 form for TennCare claims. Tenn. Comp. R. & Regs. 0780-01-73-.04.

53. When submitting claims to TennCare, the Defendants used claim forms containing the following certification:

**SIGNATURE OF PHYSICIAN (OR SUPPLIER)**: I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate, and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal or State laws.

54. Thus, when submitting claims to Medicaid, the Defendants signed the certification above or caused another CPS employee to sign the certification, and presented the claim for payment.

55. Tennessee's Medicaid False Claims Act ("TMFCA") is substantially similar to the FCA but covers claims made to TennCare. T.C.A. § 71-5-181 *et seq.*

56. A person is liable to the State of Tennessee for each instance in which the person

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program; (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim to get a false or fraudulent claim under the Medicaid program paid for approval; [or] Conspires to commit a violation of subdivision (a)(1)(A), (a)(1)(B), or (a)(1)(D)…

T.C.A. § 71-5-182(a)(1).

57. For each violation, the TMFCA provides that the person is liable for a "civil penalty of not less than five thousand dollars ($5000) and not more than twenty-five thousand dollars ($25,000), [...] plus three (3) times the amount of damages which the state sustains because of the act of that person." Id.

*The Defendant's Manipulation of Records In Furtherance of Their Forgery Scheme.*

58. The insurance companies, TriCare, Medicare and Medicaid, would only authorize a Pre-Cert or allow reimbursement of services if the ordering physician was properly licensed and credentialed. Defendant Peter Kroll is, or at one point was, licensed in the following states in addition to his Tennessee Licensure: Alabama, Arkansas, California, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Ohio, and South Carolina. During the relevant time period, Dr. Peter Kroll was the only physician at CPS who had credentialing at certain hospitals, such as Skyline Medical Center in Nashville TN. During the relevant time period, Kroll was also the only physician licensed in Kentucky, Mississippi and North Carolina, as well as other neighboring states. His forged signature was therefore utilized more frequently than the other individual Defendants.

59. When physicians or nurse practitioners that were not credentialed or licensed at certain facilities or in certain states would request services or prior authorization for services from a provider, the Defendants instructed the plaintiffs to physically cut and tape a photocopy of Dr. Kroll's signature and other physicians' signatures onto the forms, even though neither Dr. Kroll nor the other physicians had ever seen the patient, and the test was not ordered at his direction. In these situations, a non-credentialed provider is seeing

the patient, but the Defendants are representing that the credentialed provider has done so in order to obtain authorization for services and to prescribe narcotic medication, in violation of the state and federal regulations.

60. The Relators were given stacks of pages on which Dr. Kroll's signature, as well as the other individual Defendants listed in Paragraphs 11 to 30 of this Amended Complaint, had been photocopied, and were then instructed to cut and tape a physician's photocopied signature onto Pre-Certs and other documents that were subsequently submitted to providers, with the goal of obtaining reimbursements from Tricare, Medicare or Medicaid that otherwise would not have been paid. Dr. Kroll was well aware of this practice. Based upon the instructions being given, as well as the fact that the office in which the Plaintiffs worked was in charge of billing, Plaintiffs assert that all principal persons involved in this operation were part of the scheme of forging documents.

61. The Relators have personal knowledge of the following individuals, named as Defendants in Paragraphs 11 to 30 of this Amended Complaint, whose names were photocopied and provided to the Relators for the purpose of cutting and taping their names on Pre-Certs, orders, and other documents: Ronald Williams, Rex Williams, Timothy Beacham, Lindsay Bishop, Gilberto Carrero, Dennis Harris, Donald Jones, Frank Jordan, Andrew Keller, James Ladson, Charles Lindsay, Daniel McHugh, Richard Muench, Todd Pepper, Anastasia Tereschuk, Deanne Threapleton, Cody Turner, J. Randall Underwood, Kyle Payne, and Timothy Arney (now deceased).

62. Based upon the forged signature of Dr. Kroll and the other defendants listed in Paragraphs 11-30 and 50, *supra*, the insurance providers would authorize procedures because either Dr. Kroll or the others were credentialed at a particular facility or because

they were licensed in a particular state when other physicians employed by the Defendant were not, and therefore could not obtain a Pre-Cert or reimbursement for services.

63. If a credentialed provider had not signed the required Pre-Cert or other documents, then the insurance company would deny the request for services, the patient would not get the required radiological test or be prescribed narcotic medication, and the provider would not get reimbursed or paid for services rendered.

64. When the forged document was faxed to medical providers, however, the signature appeared to be authentic to the insurance provider. The Relators estimate that they would each cut and paste Dr. Kroll's name to at least forty-five (45) different documents per day, and then fax the document containing the forged signature to various medical providers in Tennessee, Kentucky, Mississippi, North Carolina, and other states. Each and every Pre-Cert or prior authorization that contained a forged signature of a provider is a false record containing false statements, many of which were submitted to TriCare, TennCare, and Medicare for payment.

65. Physician claim forms, such as Form HCFA-1500, carry an express certification that, *inter alia,* the services rendered were medically necessary and that they were rendered under the certifying physicians' immediate personal supervision by his employee. Affixing forged signatures to various certifications lead other health care providers, insurance companies, Medicare, Medicaid, and TriCare into believing that Dr. Kroll or the other individual Defendants had personally rendered the services, when in fact the services were rendered by other physicians, physicians assistants, or nurse practitioners who lacked the required credentialing or licensure.

66. The Relators grew suspicious of this practice, and frequently complained to their supervisors that this practice of cutting and taping forging signatures on documents seemed not only unethical but also imposed a significant burden on the Relators. The scheme does not end with cutting and taping Dr. Kroll's name or other physician's names to the Pre-Cert/prior authorization form. Other documents submitted in connection with the forged Pre-Cert had to match the other patient records, and the Provider's Tax ID number had to match on the documents. Thus, the Relators were instructed and trained to "fix" the related documents to match the forged Pre-Cert, in order for imaging orders to be authorized and narcotics prescriptions filled. Relator Mary Butner complained about the practice directly to the following CPS management staff: Eva Stevenson, the CPS Patient Access Manager, Angie Gambino, the CPS Team Leader, and Kim Pennington, the CPS Director of Site Operations.

67. In response to the Relators' complaints, Kim Pennington acknowledged, "if we get audited… well, we're not supposed to be cutting and taping names." Despite Ms. Pennington's knowledge that the practice was improper, if not illegal, on January 11, 2016, Ms. Pennington emailed the office and specifically instructed CPS staff to continue replacing the names of the non-credentialed providers that were on the order with a credentialed provider, and to remove any trace of the non-credentialed provider's name from the same, thus making the documents match and appear to be genuine and original.

68. When the Relators would complain about this practice, supervisor Eva Stevenson would ignore their concerns. Stevenson told the Relators that they were to "do whatever it takes" to get patients approved, keep the doctor's schedules full of patients, and she encouraged the Relators to continue the manipulation of records by cutting and taping the

individual Defendant's names to the physician's order and faxing them throughout the Mid-South. Complaints to the Human Resources department were also ignored, and would frequently result in retaliation against the Relators.

69. The Relators were instructed to train other CPS office staff in the forgery of physician's names to orders, Pre-Certs, and other documents that were ultimately submitted to TriCare, TennCare, and Medicare for reimbursement. Staff from the CPS clinic in Oak Ridge, Tennessee was brought in and the Relators were required to train them. CPS also brought in Brandy Thomas, the office manager for the CPS location in Dickson, TN, to be trained by the Relators. Other unidentified persons from various CPS locations were regularly cycled through the Gallatin Corporate Office in order to be trained by the Relators in the practice of cutting and taping physician's names to documents and manipulating patient records.

*The Relators Were Instructed to Provide False Material Statements in Patient Records, In Violation of 31 U.S.C. § 3729(a)(1)(B) and T.C.A. § 71-5-182(a)(1)(B).*

70. CPS participated in the United Healthcare Community Plan, which is a Medicaid product. The contracts were not being renewed with CPS, and CPS had been using non-credentialed AmeriGroup doctors to see those UHCP patients. The Relators complained about the situation but were still instructed to manipulate the patient's charts, including the date that the patient was first seen, in order to make it appear that the patients were being seen before the UHC contract expired, and to ensure claims would get approved and billed.

71. Most insurance providers require six to eight weeks of conservative treatment and non-narcotic medication before they would authorize a Pre-Cert for narcotics. On the

patient's first office visit at CPS, the Relators were trained and instructed to go through the new patient's prior medical records and select information that would make it appear that the patient had gone through six to eight weeks of conservative treatment, even though they clearly had not. Where there was no information to be manipulated, the Relators were instructed to completely fabricate the "first known date of treatment" for the patient, such that it would appear that the patient had six to eight weeks of conservative treatment. Each one of these manipulated records, which number in the thousands, contains false statements and is therefore a false record submitted for reimbursement through TriCare, Medicare, and TennCare.

72. The Relators used a company called "RAD MD" for imaging services. On the first day of her job, Relator Mary Butner was instructed that all questions regarding whether the patient's conservative treatment had caused any improvement were always to be answered "no." When asked if the patient was improving with the use of narcotics, the Relators were instructed to answer "no," even if the patient was, in fact, improving. When asked if the patient had any prior surgery in the area in which the imaging was requested, the answer was always "no," even if the patient had such a surgery. The facilities used by the Defendants would not complete an MRI "with and without contrasting," as required for patients with prior surgery on the area in which imaging was requested. Therefore, the Relators were instructed to answer in the negative, such that the imaging would be authorized and narcotics prescribed.

73. The Relators were instructed to find a medication that the patient had used in the past that would trigger an insurance provider's approval, such as previous history with using hydrocodone. When the patient had not previously used a narcotic medication, the

relators were instructed to fabricate "hydrocodone" and write it on the Pre-Cert. If the patient's records contained no medication at all, the Relators were instructed to write in "ibuprofen." CPS Management justified this fraud to the Relators by saying, "everybody has used ibuprofen."

74. The Relators were also trained and instructed to falsify a patient's symptoms in order to "trigger" insurance approval. For example, the Relators were specifically told that "radiculopathy" or "radicular pain" would *always* result in an insurance provider authorizing a Pre-Cert for radiology imaging and the prescription of narcotics. Thus, where there were no symptoms that would trigger approval of the patient's prior authorization, the Relators were instructed to enter the radiology ICD-9 diagnostic code 723.4 for radiculopathy of the cervical spine, or diagnostic code 724.4 for radiculopathy of the thoracic/lumbar area, even when no such diagnoses had been made by any physician. When the Relators questioned this practice, CPS Management justified it by stating, "everybody has radiculopathy." If radicular pain is how the Relators were able to obtain the Pre-Cert, they then were instructed to add the same false diagnosis to the order and to code-in radicular pain on the order so that the records would match. These false diagnoses were submitted along with the fraudulent preauthorizations in support of and material to the patient's narcotics prescription. Because there was no valid diagnosis, each one of these thousands of manipulated records are materially false, medically unnecessary, and constitute a fraud on the United States and the State of Tennessee.

75. The Relators were also instructed to add other billable products to the lab work. For example, the Relators were instructed to add "BUN and creatinine" lab work for every patient that was either diabetic or diagnosed with renal failure. The ordering physicians

would rarely request these tests, but the Relators were trained to handwrite this diagnosis on the order before it was faxed, such that the Defendants could bill for even more medically unnecessary tests.

*The Injection" Quota" & Bonus Checks.*

76. Relator Dana Brown was informed by Angie Davis, who worked in the CPS payroll department, that both Nurse Practitioners and Physicians received substantial "bonus checks" every month. In order to obtain their monthly bonuses, Nurse Practitioners were required to meet or exceed a "quota" for injections. Nurse Practitioners followed the same fraudulent Pre-Cert procedures stated herein, which utilized the forging of physician's names on documents submitted to providers. In fulfilling this quota, Nurse Practitioners would often request medically unnecessary services.

77. Patients needed prior authorizations in order to receive injections. The authorization process took numerous steps. The insurance providers required the patient to be under 8 weeks of conservative treatment, obtain physical therapy, and meet other requirements. Without meeting the authorization requirements, an insurance company would not cover the injections. Upon information and belief, CPS nurses and physicians are also not following these prerequisite procedures prior to providing injections, and are falsifying compliance in order to provide the injections, all of which is done to satisfy the CPS "injection quota," submit claims for payment, and enable the nurses and physicians to receive their substantial bonus checks each month.

*The Franklin Lab Kickback Scheme.*

78. As stated in ¶ 9, *supra,* CPS owns a testing laboratory in Franklin, Tennessee. The Defendants are required to continually monitor patients for signs of narcotic abuse,

misuse or diversion, and the Tennessee Department of Health requires that a UDT, or urine drug test, be done twice a year at a minimum. Tenn. Comp. R. & Regs 1200-34-01-.07. CPS then charges patients $1500 for a drug test designed to measure blood levels of medication, and $400 for a drug test designed to detect illegal drugs. Plaintiffs aver that the charges for these drug tests are grossly inflated and disproportional to the actual costs. Despite the conflict of interest based on its ownership interest in the drug testing laboratory, CPS used drug tests from their own lab that were then submitted as claims to Medicare, TennCare, and Tricare. Because of the illegal arrangement between CPS and the Franklin Lab, any claims submitted to Medicare by CPS or the Franklin Lab violated the Stark Law, 42 U.S.C. § 1395nn, and also constitutes false claims under the False Claims Act.

79. Relator Dana Brown injured her back and sought medical assistance from CPS. Although she refused to take any narcotic medication and informed CPS of her intention, she, like many other CPS patients, was charged $1500 for a urinalysis screen designed to detect blood levels of prescribed medication. That test served no purpose and was clearly medically unnecessary.

80. CPS would also fill prescriptions for patients whose drug tests showed that they had no levels of the prescribed medication in their blood, and, conversely, individuals whose drug tests detected the presence of illegal drugs. CPS would not follow the pill-counting procedures, would fill prescriptions for individuals who could not account for the medication, or who tested positive for the presence of illegal drugs, and would thereafter submit claims for reimbursement for all of these services.

81. The patients that did not have any detectible levels of the prescribed medication in their body, as well as those with illegal drugs detected in their urine drug screening, were sham "patients" whom the Defendant knew lacked the medical necessity for the prescription. The Defendant encouraged these patients to make appointments, knowing full well that they were repeat violators of their patient agreements and were chronic "no shows" to their scheduled appointments. Although schedule II narcotics are non-refillable under the Controlled Substances Act, 21 U.S.C. § 829, in essence, the Defendants' failure to adhere to any of the guidelines or regulations resulted in the constant refilling of prescriptions, in violation of the law.

*The Absentee Physicians & Medical Directors*

82. Under Tennessee regulations, each pain management clinic must have a physician "medical director" whose medical license is unrestricted and unencumbered, and this medical director must be on-site for at least twenty percent (20%) of the clinic's weekly total number of operating hours. *See* T.C.A. §§ 63-1-306, 309(d); Tenn. Comp. R. & Regs. 1200-34-01-.07(a). A medical director shall serve as a medical director and provide services for no more than four (4) pain management clinics. T.C.A. § 63-1-309(d).

83. Instead of being on site for 20% of the clinics weekly operating hours, the Defendant medical directors, listed in Paragraphs 11 to 30 above, were Medical Directors or "overseeing physicians" in name only, rarely travelling to the sites and instead allowing the actual office visits and prescriptions to be handled by lower-level office staff, including physicians assistants and nurse practitioners that were not properly licensed in

the states where claims were submitted, or that were not credentialed at particular facilities.

84. The Defendant doctors spend no substantial time at the pain management of which they are either the medical directors or "overseeing physicians." They do not meet the requirement of being physically present for 20% of the weekly hours seeing the patients. Despite their knowledge of this requirement, they nonetheless submit claims for payment to TriCare, TennCare and Medicare, impliedly certifying that they are complying with both the T.C.A. and Tenn. Comp. R. & Regs.

85. Pursuant to Tenn. Comp. R. & Regs. 0880-06-.02, all Nurse Practitioners are required to have 20% of their charts personally reviewed and co-signed by a medical doctor. One Nurse Practitioner affiliated with CPS, Dawn Matz, would never sign her orders and would fax them to the Relators without "locking" the order, such that the data could be manipulated more easily and Dr. Kroll's name could be cut and taped onto the order to appear as though Kroll had ordered the imaging and narcotic medication. Upon information and belief, Dawn Matz had no supervising physician on site to personally review 20% of her charts. Dawn Matz would also frequently write prescriptions for patients even though the patients had no updated imaging in their patient files, which pain clinics are required to obtain before prescribing narcotic medications. By virtue of her failure to follow state regulations, each one of these requested services was not and could not be medically necessary and therefore violated state and federal law.

86. Two Medicare products, TriCare and Healthsprings, require a primary care physician to refer a patient to a pain management specialist. The name of the referring specialist had to be on the Healthsprings form in order to be billed. Dr. Timothy Arney, a principal of

the Defendant Anesthesia Services Association, had passed away in August of 2014, yet his name was frequently included on either the "referred to" line or the "referring specialist" line of the orders, which were submitted as though Dr. Arney was still alive and had, in fact, referred the patient, such that the services could be approved and billed.

87. Referrals to Healthsprings also must be referred from a primary care physician. The Relators, using the Defendant's forgery scheme, would have to match a different doctor's name to both the referral and the order. Because the Relators could not change the name on the referral, they were instructed to change the name on the order. To expedite this fraud, the Defendants provided the Relators with a "shortcut" link on the desktop of their computers called "All Share," which contained each physician's information needed to match up the names on the referral, order, and pre-cert, all of which were reimbursed through Healthsprings.

*The Defendants' Prescription of Medically Unnecessary Back Braces In Furtherance of Their Kickback Scheme.*

88. Dr. Kroll's wife, Julie R. Kroll née Bietz, is, or was, associated with a durable medical equipment (DME) company that sells various medical equipment, including back braces. It was commonly discussed in the office that Dr. Kroll's wife was associated with Medtronic, a DME Company doing business with CPS. Upon information and belief, Dr. Kroll ordered or otherwise obtained a large cache of back braces through his wife's company. Upon information and belief, the cache of back braces, numbering in the hundreds or thousands, was sufficiently large enough that it must be stored in a warehouse. The DME was neither needed nor even utilized by the patients. Because Dr. Kroll had a financial interest in the transaction by virtue of his wife, the arrangement violated the Stark Amendment to the Anti-Kickback statute, 42 U.S.C. § 1395nn. Upon

information and belief, Dr. Kroll also received an illegal kickback for each item of DME sold by his wife's company, in violation of the Anti-Kickback Statute 42 U.S.C. § 1320a-7b.

89. Dr. Kroll would prescribe these back braces when it was clearly medically unnecessary to do so. For example, if somebody had a knee injury or an elbow injury, they were prescribed a back brace. Dr. Kroll would then submit claims for these medically unnecessary back braces through TriCare, TennCare, and Medicare.

90. Upon information and belief, the CEO of CPS, John Davis, is or was also affiliated with the same DME company as Dr. Kroll's wife, in violation of the Stark Law, 42 U.S.C. § 1395nn.

*Cash Payments From Patients.*

91. Pursuant to T.C.A. § 63-1-310(b), payments for services at pain clinics cannot be paid in cash, unless it is for a co-pay, coinsurance or deductible payment, and only when the remainder of the charge for services will be submitted to the patient's insurance plan for reimbursement.

92. One or more of the Defendants would frequently accept cash payments from patients who were not covered by any insurance accepted by CPS, in violation of T.C.A. § 63-1-310(b). With one individual, one or more of the Defendants would accept the cash for each office visit, while allowing that patient's bill to run up and exceed $20,000. Upon information and belief, the Defendants would then write off the unpaid balance as a "bad debt" while the patient was none the wiser.

*The Defendants Used Medicare & TennCare as the "Primary Insurer," Resulting in Overpayments That Defendant Was Obligated To Pay Back.*

93. Where patients had private health insurance but were also covered by Medicare and Medicaid, in most cases the private insurance is required to by billed as the "primary insurer," with Medicare or Medicaid paying as the secondary insurer. The Medicare Secondary Payer provisions require physicians and providers to submit claims by priority so that Medicare will only pay after the primary payers satisfied their obligations. 42 U.S.C. § 1395w-4(g)(3)(A; 42 U.S.C. § 1395y(b). The purpose of the Medicare Secondary Payer provisions is to prevent Medicare from becoming the primary payer to reduce Medicare costs. An overpayment will result when the secondary payer provisions are not properly applied. The United States is statutorily prohibited from paying as the primary payer when other payers may reasonably be expected to pay a claim. Secondary payer provisions must be coordinated among federally funded and private payers. 32 C.F.R. § 199.2(b); 32 C.F.R. § 199.8; 32 C.F.R. Part 220; 38 C.F.R. § 17.277; 42 C.F.R. Part 411, subparts B through H; 42 C.F.R. §422.106, 422.108. Contrary to these federal laws and regulations, the Defendant, through its agent Eva Stevenson, specifically told Plaintiffs that Medicare was primary, and that the private insurance was secondary. When claims were denied by the private insurance, documents were then manipulated, submitted, and/or resubmitted to Medicare, TriCare or TennCare until the reimbursement was complete.

94. Pursuant to 42 U.S.C. § 1320a-7b(a)(3), providers and physicians taking Medicare assignments as well as beneficiaries themselves have a statutorily created duty to disclose overpayments and billing errors to the Medicare carrier. *See also*, e.g., 42 C.F.R. §§ 401.601(d), 411.353(d).

95. When a patient is dual eligible for coverage by another program or payer, TennCare liability is limited to pharmaceutical benefits under the TennCare carve-out. Tenn. Comp. R. & Regs. 1200-13-13-.01(102); Tenn. Comp. R. & Regs. 1200-13-14-.01(102). Unless otherwise required by federal law, Medicaid is always the payer of last resort. Tenn. Comp. R. & Regs. 1200-13-12-.09(6). When a vendor receives a third party payment after Medicaid has made a reimbursement for service, the vendor must notify Medicaid and refund the payment or request a set-off in a timely fashion. Tenn. Comp. R. & Regs. 1200-13-1-.04(3).

*Destruction of the Evidence.*

96. The Relators were initially instructed to destroy the forged documents after three months. As the Defendants' forgery scheme grew and centralized, the Defendants or the Relators' supervisors subsequently instructed the Relators to destroy all forged documents after two months, and then after one month. Immediately before their termination in February 2016, the Relators were instructed to shred the forgeries immediately after they received the fax confirmation. There were up to nine (9) large, waist-high shred containers that the Relators would fill with the forgeries, each of which contained thousands of documents. Upon information and belief, the Defendants' destruction was a cover-up of material evidence in furtherance of their conspiracy, scheme, or plan to defraud Medicare, Medicaid, Tricare, and other entities.

97. The forged documents, materially false statements/records, and fraudulent certifications described herein were submitted to various entities within the State of Tennessee, and were also sent across state lines via facsimile or the mail, which actions constitute wire fraud and mail fraud in violation of federal law.

98.     The Plaintiffs believe and aver that additional acts of fraud will be discovered, and reserve the right to amend this Complaint accordingly.

**COUNT ONE:**
**VIOLATION OF THE UNITED STATES FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(A)**
*"Presentment False Claims"*

99. From at least November of 2012 to the present, the Defendants knowingly presented, or caused to be filed with the United States Government and paid to themselves through the Medicare, Medicaid and Tricare programs, claims which the defendants knew were false, or which the defendants were grossly negligent and in reckless disregard to the facts and conditions that would indicate that the claims were inaccurate or inappropriate and false, and which the entities would otherwise not have paid the services of physicians who were neither credentialed nor licensed in that particular state, and which were mislead by the Defendant's forgery scheme into believing that Dr. Kroll and the other named Defendants had provided the services, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and which fraudulent actions caused payment for the claims to be made by the United States Government containing:

   a) Claims for payment or approval of costs for office visits, precertifications, medical procedures, and prescriptions that were not medically necessary, while certifying to the United States that such claims were medically necessary. Specifically, Defendants submitted false certifications, including but not limited to Center for Medicaid Services ("CMS") Form 1500 ("Health Insurance Claim Form") for payment or approval of costs, falsely certifying that the services for which payment was sought "were medically indicated and necessary to the health of the patient and were personally furnished by [the provider] or were furnished

incident to [the provider's] professional service by [the provider's] employee under [the provider's] immediate personal supervision";

b) Claims for payment or approval of costs for office visits, precertifications, medical procedures, and prescriptions for patients that were not medically necessary because these "sham patients" did not comply with pill counts, failed drug tests showing the presence of illegal drugs, demonstrated clear signs of abuse and had drug tests demonstrating that they had no medication in their body and were likely selling narcotic medication on the black market;

c) Claims for payment or approval of costs using false CPT/ICD-9 Codes; specifically, the Defendants submitted CMS-1500 forms falsely certifying to the United States and the State of Tennessee that the CPT/ICD-9 Codes listed on the form represented visits, treatments, and/or procedures that were actually performed and diagnoses the patient actually had, when such visits, treatments and/or procedures were not performed and/or the patients did not actually have the corresponding diagnoses.

100.    By reason of the violation of 31 U.S.C. § 3729(a)(1)(A), the defendants have knowingly or recklessly damaged the United States Government in an amount to be determined at trial.

## COUNT TWO:
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
## T.C.A. § 71-5-182(a)(1)(A)
## "Presentment False Claims"

101.    From at least November of 2012 to the present, the Defendants knowingly presented, or caused to be filed with the State of Tennessee for payment, claims which the defendants knew were false, or which the defendants were grossly negligent and in

reckless disregard to the facts and conditions that would indicate that the claims were inaccurate or inappropriate and false, in violation of the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-182(a)(1)(A).

102.     Specifically, the Defendants' fraudulent actions caused payment for the claims to be made by the State of Tennessee containing:

a.  Claims for payment or approval of costs for office visits, medical procedures, and prescriptions that were not medically necessary, while certifying to the United States and the State of Tennessee that such claims were medically necessary. Specifically, Defendants submitted false certifications, including but not limited to Center for Medicaid Services ("CMS") Form 1500 ("Health Insurance Claim Form") for payment or approval of costs, falsely certifying that the services for which payment was sought "were medically indicated and necessary to the health of the patient and were personally furnished by [the provider] or were furnished incident to [the provider's] professional service by [the provider's] employee under [the provider's] immediate personal supervision";

b.  Claims for payment or approval of costs for office visits, precertifications, medical procedures, and prescriptions for patients that were not medically necessary because these "sham patients" did not comply with pill counts, failed drug tests showing the presence of illegal drugs, demonstrated clear signs of abuse and had drug tests demonstrating that they had no medication in their body and were likely selling narcotic medication on the black market;

c.  Claims for payment or approval of costs using false CPT/ICD-9 Codes; specifically, the Defendants submitted CMS-1500 forms falsely certifying to the

United States and the State of Tennessee that the CPT/ICD-9 Codes listed on the form represented visits, treatments, and/or procedures that were actually performed and diagnoses the patient actually had, when such visits, treatments and/or procedures were not performed and/or the patients did not actually have the corresponding diagnoses.

d.  Claims for payment or approval of costs impliedly certifying that the Defendants were complying with applicable Tennessee statutes, rules, and regulations, including Tenn. Comp. Rules & Regs. 1200-34-01.07 requiring the Medical Director of a pain clinic to "oversee all of the pain management services at the clinic" and "be on-site at the clinic at least twenty percent (20%) of the clinic's weekly total number of operating hours," when in fact the Defendant medical directors and "overseeing physicians" were not complying with these regulations;

e.  Claims for payment or approval of costs impliedly certifying that the Defendants were complying with applicable Tennessee statutes, rules, and regulations regarding the prior authorizations filled out by the Defendants pursuant to Tenn. Comp. Rules & Regs. 1200-13-16-.04, and that the services rendered and requested were medically necessary pursuant to Tenn. Comp. Rules & Regs. 1200-13-16-.05;

f.  Claims for payment or approval of costs certifying that the Defendants were complying with applicable Tennessee Statutes, rules, and regulations, including Tenn. Comp. Rules & Regs. 1200-13-16-.07 requiring "random drug screening as clinically indicated, but at a minimum, upon each new admission and once every six (6) months thereafter," when the Defendants were participating in an illegal

kickback scheme involving the Franklin Lab, thus rendering the claims submitted by the Defendants for reimbursement from TennCare to be false and fraudulent.

g. Claims for payment or approval of costs certifying that the Defendants were not prescribing narcotics to "sham patients" whose drug tests showed the presence of illegal drugs or the absence of the prescribed medication;

h. Claims for payment or approval of costs certifying that drug tests were medically unnecessary, when patients such as Relator Dana Brown were not even going to be prescribed any narcotic medication, but were still charged $1500 for a urinalysis screening designed to detect the presence of medication in a patient's blood stream;

2. These false or fraudulent claims for payment or approval made by the Defendants were material to the State's decision to pay the Defendants, and constitute a violation of the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-182(a)(1)(A).

3. By reason of the violation of T.C.A. § 71-5-182(a)(1)(A), the Defendants have knowingly and recklessly damaged the State of Tennessee in an amount to be determined at trial.

**COUNT THREE:**
**VIOLATION OF THE UNITED STATES FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(B)**
**"Records and Statements False Claims"**

103. From at least November 2012 until present, the Defendants made, used, or caused to be made or used, false records or statements material to false and fraudulent claims, which claims and certifications were presented, or caused to be presented, to the United States Government. The Defendants did so with knowledge that the certifications and claims were false, or with gross negligence or reckless disregard to the facts and conditions that would indicate that the claims were inaccurate or inappropriate and false,

and which caused payments for the claims to be made by the United States Government, as alleged in the Amended Complaint as follows:

   a) Defendants submitted CMS-1500 forms falsely certifying to the United States that the visits, treatments, and/or procedures were medically necessary and that the visits, treatments, and/or procedures were done by a physician or under proper physician supervision;

   b) Defendants submitted CMS-1500 forms falsely certifying to the United States that the CPT/ICD-9 codes listed on the form represented visits, treatments, and/or procedures that were actually performed and diagnoses that patient actually had, when such visits, treatments, and/or procedures were not performed and/or the patients did not actually have the corresponding diagnoses;

   c) Defendants made false statements regarding the existence of supporting documentation, medical diagnoses, and/or diagnostic testing and medical necessity of certain prescriptions to the United States in support of preauthorization and/or coverage determinations under 42 C.F.R. § 423.566 for the prescriptions the Defendants wrote for their patients; Defendants then caused to be made claims for payment or approval of costs for prescription medications by patients of the Defendants, based on false or fraudulent diagnoses and documentation made on behalf of the patients by the Defendants.

104.   These false records submitted, and false statements made, by the Defendants, were material to the Government's decision to pay the Defendants and any third parties, including the Defendants' patients and pharmacists who submit claims in reliance upon the false statements and records submitted by the Defendants which were material to

these third party claims. These false statements and records make the Defendants liable under the False Claims Act.

105.    By reason of the violation of 31 U.S.C. § 3729(a)(1)(B), the defendants have knowingly or recklessly damaged the United States Government in an amount to be determined at trial.

**COUNT FOUR:**
**VIOLATION OF TENNESSEE MEDICAID FALSE CLAIMS ACT**
**T.C.A. § 71-5-182(a)(1)(B)**
**"Records and Statements False Claims"**

106.    From at least November 2012 until present, the Defendants made, used, or caused to be made or used, false records or statements material to false and fraudulent claims, which claims and certifications were presented, or caused to be presented, to the State of Tennessee, in violation of the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-182(a)(1)(B). The Defendants did so with knowledge that the certifications and claims were false, or with gross negligence or reckless disregard to the facts and conditions that would indicate that the claims were inaccurate or inappropriate and false, and which caused payments for the claims to be made by the United States Government, as alleged in the Amended Complaint as follows:

1.  Defendants submitted CMS-1500 forms falsely certifying to the State of Tennessee that the visits, treatments, and/or procedures were medically necessary and that the visits, treatments, and/or procedures were done by a physician or under proper physician supervision;

2.  Defendants submitted CMS-1500 forms falsely certifying to the State of Tennessee that the CPT/ICD-9 codes listed on the form represented visits, treatments, and/or procedures that were actually performed and diagnoses that

patient actually had, when such visits, treatments, and/or procedures were not performed and/or the patients did not actually have the corresponding diagnoses;

3. Defendants made false statements regarding the existence of supporting documentation, medical diagnoses, and/or diagnostic testing and medical necessity of certain prescriptions to the State of Tennessee in support of preauthorization and/or coverage determinations under 42 C.F.R. § 423.566 for the prescriptions the Defendants wrote for their patients; Defendants then caused to be made claims for payment or approval of costs for prescription medications by patients of the Defendants, based on false or fraudulent diagnoses and documentation made on behalf of the patients by the Defendants.

107.    These false records submitted, and false statements made, by the Defendants, were material to the State of Tennessee's decision to pay the Defendants and any third parties, including the Defendants' patients and pharmacists who submit claims in reliance upon the false statements and records submitted by the Defendants which were material to these third party claims.  These false statements and records make the Defendants liable under the Tennessee Medicaid False Claims Act.

108.    By reason of the violation of T.C.A. § 71-5-182(a)(1)(B), the Defendants have knowingly or recklessly damaged the State of Tennessee in an amount to be determined at trial.

## COUNT FIVE:
## VIOLATION OF THE UNITED STATES FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(C)
## "Conspiracy False Claims"

109.    In performing the acts alleged herein, specifically the "presentment false claims" and "records and statements false claims" alleged above, the Defendants conspired to

defraud the United States Government in violation of 31 U.S.C. § 3729(a)(1)(C) by engaging in a scheme of forging physician's names to records and further manipulating records for the purpose of getting false or fraudulent claims to be paid, which actions damaged the United States Government in an amount to be determined at trial.

110.     From at least November 2012 to the present, the Defendants knew that they neither had admitting privileges nor credentialing required to provide or request services at numerous locations, and instead directed their employees to cut and paste the name of the individual Defendants on the documents and certifications that were submitted to hospitals, and ultimately, the United States Government.   The Defendants knew that patients did not have the proper diagnosis but instructed the Relators to write in certain non-existent diagnoses that would "trigger" a provider's approval of the prior authorization.  The Defendants knew that these false records would have a material effect on the Government's decision to pay the claims and intentionally manipulated those records to maximize their profits for claims submitted to the Government.

111.     The Defendants conspired to implement their forgery and record manipulation scheme, which the Relators were trained to follow on their first day of work, and which the Defendants requested that the Relators train the staff of other CPS offices, specifically conspiring to:

   a)  Alter patient records for the purpose of obtaining a prior authorization for office visits, procedures, services, and prescriptions that were medically unnecessary;

   b)  Alter the CPT/ICD-9 diagnostic codes on patient records to demonstrate that procedures were performed and that the patient actually had the corresponding diagnoses, and certifying that the same was true on CMS-1500 forms submitted to

the Government, when in fact the procedures were not performed and the patient did not have the corresponding diagnoses;

c) Altering patient records to contain false statements regarding the existence of supporting documentation, medical diagnoses, and/or diagnostic testing and the medical necessity of certain prescriptions in support of the prior authorizations that were ultimately presented to the United States for reimbursement;

112. From at least November 2012 to the present, the Defendants conspired with the Franklin Lab to get thousands of claims paid by the United States that were rendered false under the FCA by virtue of the Franklin Lab/CPS connection that violated the Stark Law and Anti-Kickback Statutes. Under Section 6402 of the Patient Protection and Affordable Care Act, any claim submitted by the Franklin Lab and/or the CPS clinic for urinalysis drug screening were false claims under the FCA because the Franklin Lab and/or CPS had an impermissible financial relationship which violated the Stark Law, 42 U.S.C. 1395nn, and the Anti-Kickback laws, 42 U.S.C. 1320a-7(b).

a) From at least November 2012 to the present, Defendant Peter Kroll conspired to defraud the United States by virtue of the impermissible kick-back scheme he implemented with his wife for acquiring, prescribing, and submitting for reimbursement, claims for medically unnecessary back-braces;

b) Upon information and belief, the Defendant refers patients to its own "CPS Wellness Pharmacy," which relationship violates the Stark Law, 42 U.S.C. 1395nn;

c) Upon information and belief, the Defendants receive illegal kickbacks for referrals to their own "CPS Wellness Pharmacy," specifically for a proprietary

"pain cream" made at the CPS Wellness Pharmacy, in violation of the Anti-Kickback laws, 42 U.S.C. 1320a-7(b);

113.    By these actions, the Defendants conspired to commit violations of both 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B), all in violation of 31 U.S.C. § 3729(a)(1)(C), making the Defendants liable under the False Claims Act.

## COUNT SIX:
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
## T.C.A. § 71-5-182(a)(1)(C)
## "Conspiracy False Claims"

114.    In performing the acts alleged herein, specifically the "presentment false claims" and "records and statements false claims" alleged above, the Defendants conspired to defraud the State of Tennessee in violation of T.C.A. § 71-5-182(a)(1)(C) by getting false or fraudulent claims to be paid, which damaged the State of Tennessee in an amount to be determined at trial.

115.    From at least November 2012 to the present, the Defendants knew that they neither had admitting privileges nor credentialing required to provide or request services at numerous locations, and instead directed their employees to cut and paste the name of the individual Defendants on the documents and certifications that were submitted to hospitals, and ultimately, the State of Tennessee.   The defendants knew that the false records would have a material effect on the Government's decision to pay the claim.

116.    The Defendants concocted a forgery scheme, which the Relators were trained to follow on their first day of work, and which the Defendants requested that the Relators train the staff of other CPS offices.  Specifically, the Defendants conspired to:

a) Alter patient records for the purpose of obtaining a prior authorization for office visits, procedures, services, and prescriptions that were medically unnecessary;

b) Alter the CPT/ICD-9 diagnostic codes on patient records to demonstrate that procedures were performed and that the patient actually had the corresponding diagnoses, and certifying that the same true on CMS-1500 forms submitted to the Government, when in fact the procedures were not performed and the patient did not have the corresponding diagnoses;

c) Altering patient records to contain false statements regarding the existence of supporting documentation, medical diagnoses, and/or diagnostic testing and the medical necessity of certain prescriptions in support of the prior authorizations that were ultimately presented to the United States for reimbursement;

117. From at least November 2012 to the present, the Defendants conspired with the Franklin Lab to get thousands of claims paid by the State of Tennessee that were rendered false under the TMFCA by virtue of the Franklin Lab/CPS connection that violated the Stark Law and Anti-Kickback Statutes. Under Section 6402 of the Patient Protection and Affordable Care Act, any claim submitted by the Franklin Lab and/or the CPS clinic for urinalysis drug screening were false claims under the TMFCA because the Franklin Lab and/or CPS violated the Stark and Anti-Kickback laws, 42 U.S.C. 1320a-7(b).

d) From at least November 2012 to the present, Defendant Peter Kroll conspired to defraud the State of Tennessee by virtue of the impermissible kick-back scheme he implemented with his wife for acquiring, prescribing, and submitting for reimbursement, claims for medically unnecessary back-braces;

e) Upon information and belief, the Defendant refers patients to its own "CPS Wellness Pharmacy," which relationship violates the Stark Law, 42 U.S.C. 1395nn;

f) Upon information and belief, the Defendants receive illegal kickbacks for referrals to their own "CPS Wellness Pharmacy," specifically for a proprietary "pain cream" made at the CPS Wellness Pharmacy, in violation of the Anti-Kickback laws, 42 U.S.C. 1320a-7(b);

118.     By these actions, the Defendants falsely certified on Form CMS-1500 that they were in compliance with the above-referenced statutes and they therefore conspired to commit violations of both T.C.A. §§ 71-5-182(a)(1)(A and (a)(1)(B), all in violation of T.C.A. § 71-5-182(a)(1)(C), making the Defendants liable under the Tennessee Medicaid False Claims Act.

## COUNT SEVEN:
## VIOLATION OF STARK AMENDMENT TO MEDICARE ACT
## 42 U.S.C. § 1395nn

119.     Federal law prohibits payment by Medicare or Medicaid for all claims that result from illegal medical referrals, including what is known as the Stark Law. 42 U.S.C. § 1395nn.

120.     Where a physician or a physician's family member has a financial relationship with a particular entity, the physician may not refer a patient to that entity for certain medical services and may not cause a claim to be presented for payment for those services. 42 U.S.C. § 1395nn(a). "Financial relationship" includes an ownership or investment interest in the entity, or a compensation arrangement between the physician, or his immediate family member, and the entity. 42 U.S.C. § 1395nn(a)(2).

121.     Dr. Peter Kroll had a financial relationship with the durable medical equipment (DME) company that employed his wife.  Upon information and belief, the current CEO of CPS, John Davis, also has or had a financial interest in the DME company that employs Dr. Kroll's wife.

122.     Dr. Kroll purchased or otherwise acquired back braces from the DME company in which his wife is or was at one point associated, in violation of the Stark Law.

123.     Dr. Kroll, Steven Dickerson, and other principals with an ownership interest in the Defendant Anesthesia Services Associates also have a financial interest in the Franklin Lab owned by CPS.  Dr. Kroll would refer all drug testing to this company and implemented a practice of having all CPS clinics refer their drug testing to this company, in violation of the Stark Law.

124. Upon information and belief, the Defendants also have an impermissible ownership interest in the CPS Wellness Pharmacy, in violation of the Stark Law.

## COUNT EIGHT:
## VIOLATION OF THE ANTI-KICKBACK STATUTE
## 42 U.S.C. § 1320a-7a & 7b.

125.     It is a violation of 42 U.S.C. § 1320a-7b for any person to receive or offer remuneration, including a rebate, in return for purchasing leasing, ordering, arranging for, or recommending any good, facility, service or item or for referring an individual to a healthcare provider who charges the United States for any portion of the services provided to that person.  Section 1320a-7b provides for criminal penalties, while Section 1320a-7a provides for civil monetary penalties.

126.     The Defendants prescribed and sold back braces to beneficiaries for which back braces were not medically necessary.

127. The Defendants engaged in a scheme of illegal kickbacks for the sale of durable medical equipment, including back braces.

128. The Defendants prescribed and sold drug tests from a drug-testing lab in Clarksville in which Dr. Kroll has a financial interest. These drug tests cost up to $1500. Upon information and belief, the Defendants violated the anti-kickback statute by receiving remuneration for the sale and prescription of these drug tests. Upon information and belief, illegal kickbacks were provided for the sale and analysis of drug tests procured and implemented from the lab owned by CPS.

129. Upon information and belief, the Defendants receive illegal kickbacks for the sale of certain drugs, including a proprietary "pain relief cream" that is made in their CPS Wellness Pharmacy, in violation of the Anti-Kickback Statute.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs United States of America and The State of Tennessee *ex rel.* Mary Butner, Dana Brown pray that judgment be entered against the Defendants, each of them jointly and severally:

a. For damages for violations of 31 U.S.C. §§ 3729(a)(1)(A) to (C) and T.C.A. §§ 71-5-182(a)(1)(a) to (C);

b. That damages be trebled pursuant to 31 U.S.C. § 3729(a) and T.C.A. § 71-5-182(a);

c. For reasonable attorney's fees and costs pursuant to 31 U.S.C. § 3730(d) and T.C.A. § 71-5-183(d)(1)(C)

d. That Relators receive a percentage of the recovery in accordance with 31 U.S.C. § 3730, and T.C.A.§ 71-5-183(d).

43

e. In addition, Plaintiffs pray for such further and additional relief at law or in equity that this Court may deem appropriate or proper, including any penalties or liquidated damages that may be available.

Respectfully submitted,

W. Gary Blackburn (#3484)
Bryant Kroll (#33394)
THE BLACKBURN FIRM
213 Fifth Avenue North, Suite 300
Nashville, TN 37219
Phone: 615-254-7770
Fax: 866-895-7272
gblackburn@wgaryblackburn.com
bkroll@wgaryblackburn.com

Jeffery S. Roberts #20263
GRIFFITH & ROBERTS, PLLC
213 Fifth Avenue North, Suite 300
Nashville, TN 37219
Telephone: (615) 425-4400
Facsimile: (615) 425-4401
jroberts@griffithroberts.com

## CERTIFICATE OF SERVICE

       I hereby certify that a copy of the foregoing has been served, via first class mail, upon the following:

United States Attorney's Office
Middle District of Tennessee
110 Ninth Avenue South, Suite A-961
Nashville, TN 37203

United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Office of the Attorney General and Reporter
425 5th Avenue North
P.O. Box 20207
Nashville, TN 37202

On this _27th_ day of April 2016.

Bryant Kroll